# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

1. Joseph Barnes
2. Kaylene Holub
3. Socorro Yosuico

for themselves and on behalf of all others similarly situated,

Plaintiffs,

v.

THE UNITED STATES OF AMERICA

Defendant.

Case No. 04-1335C

**PLAINTIFFS' ADDENDUM TO BRIEF REGARDING DEFENDANT'S PROPOSED COUNTERCLAIM**

(Judge Allegra)

Plaintiffs respectfully submit the attached case, *American Airlines, Inc. v. United States,* No. 04-1736C (Filed November 30, 2006), as the discussion on page 7 related to counterclaims and affirmative defenses is relevant to the issues currently pending before the Court.

Respectfully submitted,

s/Robert W. Brownlie
ROBERT W. BROWNLIE
DLA Piper US LLP
401 B Street, Suite 1700
San Diego, CA 92101-4297
Telephone: (619) 699-2854
Facsimile: (619) 699-2701

Attorneys for Plaintiffs

Date: December 6, 2006

Of Counsel:

CURTIS R. COTTON
DLA Piper US LLP
San Diego, CA

IRA M. LECHNER
Escondido, CA

# In the United States Court of Federal Claims

No. 04-1736C
Filed November 30, 2006
**TO BE PUBLISHED**

| | |
|---|---|
| AMERICAN AIRLINES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Counterclaim, RCFC 13(a);<br>Discovery;<br>Affirmative Defense, RCFC 8(c);<br>Protective Order, RCFC 26(b), (c);<br>Set Off. |

**Adam P. Feinberg**, Miller & Chevalier Chartered, Washington, D.C. counsel for plaintiff.

**Kyle Eric Chadwick**, United States Department of Justice, Washington, D.C., counsel for defendant.

## MEMORANDUM OPINION REGARDING DISCOVERY AND EVIDENTIARY DAMAGES HEARING SCHEDULING ORDER

**BRADEN**, *Judge*.

On November 30, 2005, the court issued a Memorandum Opinion and Order granting American Airlines, Inc. ("Plaintiff")'s Motion for Partial Summary Judgment and holding that the United States ("Government") did not have authority under the Immigration User Fee Statute, 8 U.S.C. § 1356 to impose liability on Plaintiff for the payment of any *uncollected* Immigration User Fees. *See Am. Airlines* v. *United States*, 68 Fed. Cl. 723, 731-32 (2005). Therein, the court also held that the Government did not have authority under Agricultural Quarantine Inspection regulations, 7 C.F.R. § 354.31(f), to impose liability on Plaintiff for the payment of any *uncollected* AQI User Fees. *See Am. Airlines*, 68 Fed. Cl. at 732. Therefore, the remaining issue for the court to determine is the amount that "plaintiff has paid . . . over to the Government[.]" *Merck & Co., Inc.*, v. *United States*, 24 Cl.Ct. 73 (1991) (quoting *Eastport S.S. Corp*. v. *United States*, 178 Ct. Cl. 599, 605 (1967)).

On July 12, 2006, the court convened a status conference to discuss the damages phase of this proceeding.

THE COURT: And how are you going to prove to me the amount that you paid the government?

PLAINTIFF'S COUNSEL: Well, there's no dispute about the amount that was actually paid. I think the only question is, did that entire amount represent fees that were uncollected, versus fees that were somehow collected by American Airlines but mistakenly accounted for, and therefore not admitted to the government. And I think we would go about proving that in a number of ways.

First of all, the audits themselves purport to test for collection. And I realize the government takes issue with that to some extent. But if you just look at the face of the audit reports, they say they're "testing for collection," and there's an entire section on collection compliance.

And if you look at the terminology they use, they literally say these errors represent uncollected user fees. So right off the bat I think the parties understood, at the time of the audit, that these fees were for uncollected user fees.

And I agree with the government's point that, in a metaphysical sense, it is of course somehow possible that some of these fees were actually collected by American Airlines. For example, that some ticket agent collects them after the fact and takes the three dollars in cash and puts it in his or her pocket, and doesn't record that at all.

But aside from things like that, the government hasn't suggested any possible way that these user fees could have been actually collected by American Airlines and stashed somewhere, and not put in the correct user fee account. And I think that that is a major element of our proof.

Another element, and I think this is extremely important as well, the only possible ways that these user fees could be collected -- and there really are only two -- one is at the time of ticketing and the second is after the fact. . . I don't think there's much dispute about user fees collected at the time of ticketing, because that's done essentially on an entirely automated process, and all of the taxes and user fees are collected by computer and they are put into the correct codes, and the money goes into the correct accounts.

It's worth noting that the government is, in its auditing process, looking at fees that are collected -- in other words tickets that evidenced fees were collected -- and then it tests to make sure that those fees go through the entire system appropriately.

And the government argues in its reply that, well, that's not really relevant, because that only goes to tickets that evidence collected fees, as opposed to tickets that don't evidence that. And that's true to a point, but that's still a very important fact, because

it demonstrates that the systems that American Airlines is using are actually working properly. And that when something says it was collected, it goes into the proper account. And in none of these audits did the government ever point to one single user fee that it claimed was collected, and evidences collection on the ticket, but then didn't end up in the proper account. And that of course speaks to the sufficiency of the systems that American Airlines has in place to deal with these fees.

THE COURT: Right. Let me hear from the government briefly, because I think I know where I want to go with this, and we'll see what happens.

PLAINTIFF'S COUNSEL: Okay.

GOVERNMENT'S COUNSEL: Our point, Your Honor, really is that we're in ordinary civil discovery, and we're entitled to inquire into and check whether all the representations and arguments of counsel you have just heard for the last few minutes are accurate. Those things are all nice to say, and I believe Mr. Feinberg says them in good faith, and may all turn out to be true. But this is discovery. We are entitled to find out whether it is possible that for instance fees could be collected and not end up in the proper account, and not be recorded properly. We may find out that's not possible, as Mr. Feinberg says. We don't know that, other than through representations.

And it is certainly the case that there were instances in which tickets did not show collection during the audits, and the auditors asked for evidence. And then American went and found some other evidence, outside the ticket, of collection. So there clearly is at least one other way to collect, and we don't know just what --

THE COURT: What specifically do you want to do?

GOVERNMENT'S COUNSEL: *We have a damages firm* that we have just about retained, essentially are ready to retain, *that would like to examine the controls all the way through the process to determine, on a sort of sampling basis -- we're not talking about a criminal-style investigation, we're talking about an account investigation -- to see what the controls are, exactly when things are collected, and whether we can,* in fact, find any evidence of collection that --

THE COURT: And how long will it take them to do this process?

GOVERNMENT'S COUNSEL: It's a three- to six-month job.

THE COURT: Okay. And what would American Airlines have to do if I granted the government's motion?

> GOVERNMENT'S COUNSEL: *American Airlines would have to make available to us* not the entire universe, but *samples of* --
>
> THE COURT: Well, I know what you need to do. Would you do it internally, or would you do it with an outside consulting firm? Could they come in and do it?
>
> GOVERNMENT'S COUNSEL: Well, we have a testifying expert's firm in effect here to do that.
>
> THE COURT: Who would work on your side.
>
> GOVERNMENT'S COUNSEL: Yes.
>
> THE COURT: All right. Here is what I'm going to do. I'm going to grant to give the government what they want. I'm going to give them three months to do it, and I'm going to order that they have to pay for American Airlines's outside expert, because I found that the statute was unlawful to begin with. To impose additional money on a company that shouldn't have had to go through this process and the internal costs to begin with it seems to me is over the hill.
>
> So I'm going to give the government what they want, but they're going to have to pay for it. And so the longer it goes on, the more it's going to cost the government ultimately.
>
> So we'll do it, and I'm going to expect a report from the government, I will expect the government basically to file a report and a final assessment of the damages in three months.

TR at 5-10 (emphasis added).

On August 1, 2006, the court was informed that Plaintiff retained the accounting firm of Deloitte & Touche to assist in responding to the discovery that would be requested by the Government's accounting expert, Navigant Consulting, Inc. Accordingly, on that date, the court issued an Order, regarding the scope of discovery and assignment of costs as discussed in the court's August 1, 2006 ruling.

On October 27, 2006, Plaintiff filed a Motion for a Protective Order ("Pl. Mot."), pursuant to RCFC 26(b), (c), wherein the court was advised that:

> The Government, . . .[now], claims that the actual damages could theoretically be lower if some of the "confirmed error" tickets represent instances where AA collected, but failed to remit, the user fees. The Government argues that its "auditors have never assessed whether, for tickets bearing no evidence of user fee

collection, fees might have been collected, but not remitted." Doc. No. 35 at 6. Thus, the Government claims it is "entitled to pursue that inquiry in discovery." *Id.* The Court has already stated that it will allow the Government to do so, and AA is willing to produce (and already has produced) materials relevant to that inquiry.

While most of the Government's discovery requests are potentially relevant to that inquiry, a handful are not. Those discovery requests have nothing to do with answering the question of whether the "confirmed errors" represent tickets where user fees were collected, but not remitted. Instead, they relate to a completely separate aspect of the audits – an aspect in which the Government auditors found no errors at all – in an attempt by the Government to now find new errors the auditors did not uncover before.

*The discovery requests at issue relate to the method that airlines use to allocate to the proper accounts a small portion of the taxes and user fees they collect.* Airlines collect a variety of taxes, fees, and charges ("TFCs") on behalf of governments and airports. Each of these TFCs has been assigned a two-letter code by the International Air Transport Association ("IATA") –an airline industry association responsible for promulgating various industry standards. The APHIS and Immigration user fees at issue in this case are designated "XA" and "XY"respectively. Each collected TFC is recorded in one of three "TFC boxes" on the industry standard ticket. The "XT" code is used when an airline collects more than three TFCs on one ticket. In such situations, two TFCs can be recorded in their own TFC boxes, and the IATA Ticketing Handbook instructs airlines and agents to accumulate the remaining TFCs into a third TFC box and to use the code "XT" in that box, while recording in the "fare calculation line"information for each TFC so that airlines (or other fee collectors) know which TFCs the collected money was for. Airlines (and other collectors) then use this information to assign the correct amount to each specific tax code (*e.g.*, XA or XY) so it can be paid to the government agency or airport to whom it its owed.

An issue arises, however, when there is not enough information in the fare calculation line to properly assign the money collected. Even though this happens on a very small percentage of tickets, there are too many tickets for an airline to be able to check each one by hand. Accordingly, AA takes a sample of these tickets, researches each one to figure out which TFCs should have been collected, and then uses this sample to allocate the otherwise unassigned TFCs with an "XT" code to the proper specific TFC codes (*e.g.*, XA and XY). AA does the same thing with respect to the "ZZ" code, which operates in exactly the same fashion as the"XT" code.

This XT and ZZ allocation methodology is old news to the Government. In addition to performing the exercise described above . . . to identify "confirmed errors," the Government auditors also performed a variety of other tests of "the

adequacy and reliability of [AA's] internal controls, collections, recording, reporting, and remittance systems for user fees."AA's Fact. App. at 41. One such test was a specific review of AA's XT and ZZ allocation methodology, including a review of the workpapers documenting one of AA's actual monthly samples and allocations. If the Government auditors determined that AA's allocation methodology was improper, it presumably would have said so in the audit reports and would have made additional assessments against AA. However, it did not do so. More importantly for present purposes, the XT and ZZ allocations have absolutely nothing to do with the "confirmed error" tickets that served as the basis of the Government's audit assessments that AA paid.

Pl. Mot. at 1-4 (Doc. No. 46) (emphasis added) (footnotes omitted).

On November 15, 2006, the Government filed an Opposition ("Gov't. Opp."), arguing that:

[O]ur consistent position has been that (i) AA bears the burden to substantiate that illegal exactions of specific amounts occurred – i.e., that AA, in fact, remitted to the United States Department of Agriculture or U.S. Customs and Border Protection specific amounts for agricultural quarantine inspection user fees or immigration inspection user fees that AA did not owe to the Government at that time, and (ii) we are entitled, as a consequence, to pursue those same questions in discovery. Whether the user fees deposited into the XT and ZZ accounts are eventually remitted to the Government in full is plainly relevant to those questions.

* * *

AA has established to this Court, at most, only that the legal theories pursuant to which the agencies sought remittance of "uncollected user fees" were erroneous. 68 Fed. Cl. at 731-32. It does not follow, as a matter of law, that AA is entitled to "reverse the charges" and recover the dollar amounts it paid following the user fee audits. See Pl. Br. 1. AA must prove, instead, that it paid specific amounts of money to the agencies that, at the time of the payments, AA did not owe. Merck, 24 Ct. Cl. at 91. By the same token, *we are entitled under the Court's Rules to discovery calculated to uncover facts that may bear upon the amounts of these alleged overpayments*. RCFC 26(b)(1). (Alternatively, even if it is determined that AA's payments are prima facie evidence of the amount of its damages, we should at least have the opportunity to look behind the audit papers and inquire into whether AA in fact collected the user fees it now claims not to have been collected.) . . . AA bears the burden to establish that it paid the agencies a specific amount more than it owed in user fees. That is what we need to explore in discovery.

Gov't Opp. at 5, 7 (Doc. No. 47) (emphasis added).

The Complaint in this case was filed on December 6, 2004. On July 2, 2005, July 18, 2005, and March 2, 2005, the Government requested additional time to file an Answer. On each occasion, the Government's request was granted. On December 22, 2005, the Government filed an Answer, without a counterclaim or a set off defense.

Rule 13(a) of the Rules of the United States Court of Federal Claims requires that: "The answer shall state as a counterclaim any claim which, *at the time of serving of the answer*, the defendant has against any plaintiff, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." RCFC 13(a) (emphasis added). If Plaintiff collected fees that were not remitted to the Government, any such claim existed prior to December 22, 2005, the date on which the Government filed an Answer. Therefore, discovery to establish a minimum factual basis for such a counterclaim, was required to be conducted by the Government prior to filing the Answer. Even at that juncture, however, the Government was not entitled to unlimited discovery, but was required to come forward with "some concrete and positive evidence, as opposed to a mere theoretical argument, that there is some substance to its claim[.]" *Missouri Pac. R.R. Co.* v. *United States*, 338 F.2d 668, 672 (1964). The Government did not do so then or now.

The Government also did not plead set off as an affirmative defense. *See* RCFC 8(c). Failure to plead an affirmative defense is a waiver of that defense. *See* 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE §1278 (1990); *see also Mahoney* v. *United States*, 223 Cl. Cl. 713, 715 (1980) (*per curiam*) (denying discovery where the Government filed an amended answer "to assert offsets in order to qualify itself to search for facts by discovery."). Therefore, to the extent the Government is now seeking discovery to establish a counterclaim or set off, that time has passed.

The Government accounting expert's affidavit states that: "American Airlines allocates monies recorded using [the XT and ZZ] codes [to its user fee remittance accounts] based upon a methodology that [AA] created." Woolfley Aff. ¶¶ 9. Therefore, the Government asserts that the court should not "bar us from conducting discovery concerning the XT and ZZ allocations[.]" Gov't Opp at 10. Neither 8 U.S.C. § 1356 nor 7 C.F.R. § 354.31(f), mandate any methodology for determining the amount of user fees due thereunder. Therefore, Plaintiff could utilize any methodology it wanted, so long as the fees due were paid to the satisfaction of the Government auditors. There is no indiction in this record that Plaintiff did not satisfy the auditors's requirements. Since the court has determined that the Government's imposition of liability for uncollected user fees was unlawful, how Plaintiff collected those fees is irrelevant. What is relevant at this juncture is the amount that Plaintiff has paid to the Government. *See Eastport S.S. Corp.*, 178 Ct. Cl. at 605.

At the July 12, 2006 conference, the Government represented to the court that "[we] would like to examine the controls all the way through the process to determine on a sort of *sampling basis* – we're not talking about a criminal-style investigation[.]" TR at 9. Almost six months later, the Government asserts that the court should not "bar us from conducting discovery concerning . . . *any other user fee-related accounting issues that may arise. See* Gov't Opp. at 10 (emphasis added).

The court disagrees. *See Missouri Pac. R.R. Co.*, 338 F. 2d at 672 (warning that the Government may not misuse discovery as a "mere fishing expedition or a method of discouraging taxpayers from seeking refunds on meritorious claims because of the cost that would result in proving each and every item involved[.]"). In the court's judgment the Government has taken advantage of the limited additional discovery that it represented was required at the July 1, 2006 status conference.[1]

Accordingly, the Government may continue to conduct the limited discovery authorized by the court's August 1, 2006 Order and within the deadline of December 5, 2006 established therein. In addition, the court hereby enters the following, evidentiary damages hearing schedule to which the parties have concurred:

1. Expert Discovery. Plaintiff will provide all expert reports regarding damages to the Government **on or before February 1, 2007**. The Government will file all relevant discovery motions relating to Plaintiff's expert reports regarding damages **on February 15, 2007.** Likewise, the Government will provide all expert reports to the Plaintiff **on or before March 15, 2007.**

   If the parties plan to call witnesses other than experts at the May 14-16, 2007 evidentiary damages hearing, the parties will file the list of any such witnesses at the same time the expert reports are exchanged.

   The parties will hold any necessary depositions during the month of **April 2007**. The parties will make witnesses available at reasonably convenient locations and times. The parties are reminded that the rules of the court contemplate the use of depositions at trial for testimonial purposes in certain circumstances "as though the witnesses were then present and testifying[.]" *See* RCFC 32(a).

2. Expert Testimony. The parties will provide written, direct expert testimony to opposing counsel **on or before May 9, 2007 at 5 p.m.**

---

[1]At the November 21, 2006 conference, Plaintiff's advised the court that the Government's discovery inquiry from August 1, 2006 to date required Deloitte & Touche to incur costs of approximately $185,000.

3. Evidentiary Damages Hearing. The evidentiary damages hearing will be held **on May 14-16, 2007** at the National Courts Building, 717 Madison Place N.W., Washington, D.C. 20005. The hearing will begin at 10 a.m. each day.

**IT IS SO ORDERED.**

s/Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of December, 2006, a copy of the foregoing "PLAINTIFFS' ADDENDUM TO BRIEF REGARDING DEFENDANT'S PROPOSED COUNTERCLAIM" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Robert W. Brownlie